IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| GLORIA LAWSON, | ) | Civil Action No. 3:10-212-HFF-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District.  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff applied for DIB on March 21, 2005, alleging disability as of December 9, 2004.  Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ").  After a hearing held July 17, 2008, at which Plaintiff appeared and testified, the ALJ issued a decision dated September 3, 2008, denying benefits and finding that Plaintiff was not disabled.  The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff could perform.

Plaintiff was forty-nine years old at the time of the ALJ's decision.  She has a high school education with three years of college and past relevant work as a senior lab technician. (Tr. 36, 96,

279, 281). Plaintiff alleges disability due to lumbosacral degenerative disc disease, osteoarthritis, bronchitis, and depression.

The ALJ found (Tr. 23-38):

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.    The claimant has not engaged in substantial gainful activity since December 9, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et. seq.*).

3.    The claimant has the following severe impairments: lumbosacral degenerative disc disease, osteoarthritis, bronchitis and depression (20 CFR 404.l520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the RFC to perform light work as defined in 20 CFR 404.1567(b) except that she is limited to entry level unskilled work, could not work around hazards, would need a climate controlled environment, and could not squat or bend from the waist or do overhead reaching.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on January 3, 1959 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 9, 2004 through the date of this decision (20 CFR 404.1520(g)).

On January 13, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner.  Tr. 4-7.  Plaintiff then filed this action in the United States District Court on January 28, 2010.  On September 23, 2010, based on a subsequent application for DIB and supplemental security income benefits,[1] Plaintiff was found disabled as of October 9, 2009.  See Doc. 20.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972).  Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...."  See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

**MEDICAL EVIDENCE**

Plaintiff has primarily been treated for her various medical conditions (including degenerative disc disease, osteoarthritis, bronchitis, and depression) by Dr. Robert Kaemmerlen, a family practice physician.  Dr. Kaemmerlen's treatment consisted primarily of the prescription of pain medications,

---

[1]In the subsequent application, Plaintiff sought a period of disability beginning October 9, 2009.

3

anti-depressants, antacids, and muscle relaxants. See Tr. 137, 139, 156, 206-242, 246, 248-250, 268-269, 272-274.

On May 3, 2004, Plaintiff complained of pain in her knees, back, elbow, and wrists, but noted that Lortab and Celebrex helped her. Dr. Kaemmerlen reviewed an MRI from 1999, which he thought revealed significant degenerative disc disease for someone as young as Plaintiff. Plaintiff's rheumatoid factor and sedimentation rates were reportedly normal. Dr. Kaemmerlen noted that Plaintiff was taking Nexium for chronic gastroesophogeal reflux disease and was not taking an anti-depressant. He wrote that Plaintiff was thinking about disability with her job. Tr. 242.

On October 2, 2004, an MRI of Plaintiff's spine revealed degenerative changes at multiple levels. The most pronounced changes were at the L4-L5 and L5-S1 levels. There was evidence of disc herniations at both levels with compression of the S1 nerve root. The herniation at L4-L5 did not cause nerve root compression, but there were small disc bulges at other levels which were associated with spinal stenosis caused by facet joint changes. Tr. 161-163.

On October 8, 2004, Plaintiff reported to Dr. Kaemmerlen that she had symptoms involving her back with minimal sciatica with pain going to the back of her knee. Plaintiff also complained of pain in her upper back and hips, but no pain in her hands. She told Dr. Kaemmerlen that she wanted to try to get disability. He told her it was a long, uncertain road and tried to encourage other options. Plaintiff told Dr. Kaemmerlen that she did not want to go to an orthopedist. Dr. Kaemmerlen opined that Plaintiff should consider Cortisone injections, as physical therapy had not worked. Tr. 239.

Plaintiff consulted with Dr. Darwin Keller, a neurological surgeon, on November 24, 2004. She said that she had been experiencing chronic back pain for quite some time, which become more severe over the previous three months. Plaintiff also reported a long history of all over joint pain.

4

She reported that the pain radiated down to her knee, but not below, and she had numbness in her low back area.  Plaintiff felt that there was some weakness in her left leg, but denied any new bladder or bowel difficulties.  Tr. 187.

Dr. Keller's physical examination revealed no point tenderness, a slight decrease in the range of motion of Plaintiff's lumbar spine, positive straight-leg raise testing on the left at about 60 degrees, negative straight-leg raise testing on the right, no obvious weakness, and fair strength in both heel and toe walking.  He noted that Plaintiff was not ready to discuss surgery, had elected to proceed with a third epidural block, and would return to discuss surgery if that provided no relief.  Tr. 187-188.

On November 30, 2004, Plaintiff indicated to Dr. Kaemmerlen that she had visited Dr. Keller and wanted to think about surgery.  Dr. Kaemmerlen renewed Plaintiff's prescription for Lortab.  Tr. 236.

In December 2004, Dr. Keller performed surgery on Plaintiff, which consisted of an extended semi-hemilaminectomy at L5-S1 on the left with an excision of the disc and osteophyte and nerve root decompression.  Tr. 166-167.  In January 2005, after Plaintiff complained that her prescribed medications made her sleepy, Dr. Keller prescribed Lortab.  Dr. Keller noted that Plaintiff had been on Lortab for years, warned her about the chronicity and particular addictive properties of Lortab, prescribed exercises, and instructed Plaintiff to start a walking program.  Tr. 186.

On February 7, 2005, Dr. Keller noted that Plaintiff had limited range of motion and was slow in her movement.  She reported some problems with her knee and Dr. Keller opined that Plaintiff might need to have to have some work done on it.  From the standpoint of her back, however, Dr. Keller thought that Plaintiff was doing reasonably well.  He noted that Plaintiff was "inclined to lean away from getting well and getting back to work."  He concluded that "[o]therwise, from the

5

standpoint of what I have seen her for, she will be released to return to work without restrictions on March 9th." Tr. 185.

Plaintiff complained of pain radiating down her leg on February 21, 2005. She reported to Dr. Kaemmerlen that her pain was better controlled with muscle relaxers rather than pain medication. She said she was doing the exercises prescribed by Dr. Keller, but was not sure she would be able to return to work in March. Tr. 235.

On April 1, 2005, Plaintiff reported to Dr. Kaemmerlen that Tylenol with Codeine was not controlling her pain. Dr. Kaemmerlen changed her medication to Vicodin. He noted that she was taking Celebrex for osteoarthritis in her shoulders and back. During a May 2, 2005 visit, Plaintiff was noted to be doing reasonably well, although she had pain in her upper extremities and shoulders. Dr. Kaemmerlen opined that Plaintiff had diffuse osteoarthritis in addition to degenerative back disease. Tr. 231.

Dr. Kaemmerlen completed a form titled "Multiple Impairments Questionnaire" at the request of Plaintiff's attorney in May 2005. He stated he had treated Plaintiff since October 2004 for degenerative disc disease and a herniated disc. Plaintiff's prognosis was described as guarded. Dr. Kaemmerlen noted that positive clinical findings and primary symptoms were limited mobility, left arm pain, neck pain, upper back pain, and lower back pain. Dr. Kaemmerlen indicated that Plaintiff's pain was usually worse with exertion, but noted that Lortab helped her. He opined that Plaintiff could lift a maximum of ten pounds occasionally; stand/walk for one hour in an eight-hour workday; sit for one hour in an eight-hour workday; should not sit continuously in a work setting; had significant limitations on her abilities for repetitive reaching, handling, fingering, and manipulation; and had pain and fatigue that was severe enough to interfere with attention and concentration. Dr.

Kaemmerlen indicated that Plaintiff's symptoms were likely to increase if she was placed in a competitive work setting, her impairments would last for twelve months, and emotional factors did not contribute to the severity of her symptoms and limitations.  He also opined that Plaintiff would be able to tolerate moderate work stress, would need to take unscheduled breaks every thirty to sixty minutes, would miss work more than three times a month, and had no psychological or environmental limitations.  Tr. 223-230.

In June 2005, Plaintiff presented another form from her attorney for Dr. Kaemmerlen's consideration.  She reported that surgery had not relieved her pain, which she described as constant and dull. She was taking four Lortab a day and said she was disabled and would not return to work. Dr. Kaemmerlen thought this was "probably reasonable."  Tr. 222.

On June 16, 2005, Dr. Steven Fass, a State agency physician, reviewed Plaintiff's medical records and assessed Plaintiff's residual functional capacity ("RFC").  Tr. 189-196.  Dr. Fass opined that Plaintiff had the RFC to occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty-five pounds; sit, stand and/or walk for six hours in an eight-hour workday; and had no limitations on her ability to push or pull.  He noted that there were essentially no objective data in the record subsequent to Plaintiff's back surgery, only Plaintiff's subjective complaints and subjective statements from Dr. Kaemmerlen.  Dr. Fass wrote that there was "no reported testing of motor neuro, strength, ROM [range of motion], etc."  Tr. 191.  He opined that it was too early in the post-operative course to obtain a consultative examination and anticipated that by one year after surgery Plaintiff would be able to perform medium work.  Dr. Fass thought that the severity and duration of Plaintiff's symptoms were disproportionate to that expected and stated that "[w]hile chronic pain is given significant consideration, longitudinal records note [that Plaintiff] had been

discussing disability for many months (as early as 5/04, or earlier), well before agreeing to try various [treatments]." He also noted Dr. Keller's observations that questioned Plaintiff's motivation to work and Dr. Kaemmerlen's notes, which did not suggest Plaintiff's condition was severe enough to warrant disability. Dr. Fass noted that Dr. Kaemmerlen's answers on the questionnaire contained more restrictions than Dr. Kaemmerlen's earlier treatment notes. Tr. 194.

On October 3, 2005, State agency physician Dr. Hugh Clarke reviewed Plaintiff's medical records and opined that Plaintiff had the RFC to perform a range of medium work; had occasional limitations in balancing and climbing ramps, stairs, ladders, ropes, and scaffolds; and should not have concentrated exposure to hazards. He noted that although Dr. Kaemmerlen listed arm pain, neck pain, and upper and lower back pain as clinical findings, Dr. Kaemmerlen also noted that Plaintiff no longer had sciatica and her medications helped. Dr. Clarke wrote that there were no objective statements/evidence to support Dr. Kaemmerlen's assessment. Tr. 198-205.

In October 2005, Dr. Kaemmerlen completed a "Lumbar Spine Questionnaire" from Plaintiff's attorney. He assessed Plaintiff's prognosis as fair with minimal improvement following surgery. He thought that Plaintiff was limited to walking one-half block secondary to disabling back pain, with muscle spasm and minimal swelling. Straight-leg testing was positive on the left and negative on the right. Plaintiff, however, did not have an abnormal gait, sensory loss, reflex changes, muscle atrophy, muscle weakness, crepitus, or trigger points. Dr. Kaemmerlen thought that Plaintiff was only capable of low amounts of work stress due to depression and pain. He further wrote that he believed that Plaintiff had "a disabling condition and arthritis in her back far outweighing her young age." Dr. Kaemmerlen opined that Plaintiff should not stand or walk continuously and could lift/carry a maximum of ten pounds. He indicated that Plaintiff could not keep her neck in one

8

position for thirty minutes and would be unable to perform a job that required this activity. He thought that Plaintiff seldom experienced pain severe enough to interfere with concentration and attention, but that depression contributed to the severity of her symptoms. He also opined that Plaintiff needed to avoid work at heights, pushing/pulling, kneeling, bending, and stooping. The only noted adverse side effects of Plaintiff's medications (Lortab, Celebrex, and muscle relaxants) was occasional blurred vision. Although Dr. Kaemmerlen stated that he had been able to completely relieve Plaintiff's pain with medication without unacceptable side effects, he opined that Plaintiff had a disabling condition. Tr. 215-221.

On April 4, 2006, Plaintiff had been off Lortab for a week and had done reasonably well, but reported that the medication allowed her to be a bit more functional as to going to the store, cooking, and other activities. Dr. Kaemmerlen noted that Plaintiff was able to walk into and out of the examination room and did not appear to be in overt distress. Tr. 210. On August 4, 2006, Dr. Kaemmerlen thought that a referral to an orthopedist might be beneficial to Plaintiff, but implied that she did not have the $300 minimum deposit required for her to be seen and evaluated. He noted that Plaintiff's blood pressure was evaluated and she complained of pain. Tr. 208.

On September 28, 2006, Dr. Kaemmerlen wrote a "NARRATIVE REPORT" in which he stated that the symptoms and limitations that Plaintiff had at that time had been present since October 2004 and she had gained only minimal improvement with surgery. He wrote that Plaintiff had pain with walking even one-half a block, muscle spasm, minimal swelling, positive straight-leg raise testing on the left, fatigue, left arm pain, neck pain, and limited mobility. He said that his findings were supported by MRI findings and consistent with the findings of Dr. Keller. Dr. Kaemmerlen opined that Plaintiff was limited to sitting, standing and/or walking for one hour total in an eight-hour

9

workday; would need to get up and move around about every thirty minutes; and then could not sit again for approximately one hour.  He thought Plaintiff could only lift and carry up to ten pounds; would experience significantly increased pain with any repetitive reaching, handling, fingering, or lifting; had pain, fatigue, and other symptoms that would frequently interfere with her attention and concentration; had depression that would also contribute to her functional limitations; and would be absent from work three or more times a month as a result of her impairments or treatment.  Dr. Kaemmerlen also opined that Plaintiff needed to avoid heights, and not engage in pushing, pulling, kneeling, bending, or stooping.  Tr. 155.

On December 4, 2006, Dr. Kaemmerlen increased Plaintiff's prescription for Lortab from 7.5 to 10 milligrams four times a day.  Tr. 206.  On April 3, 2007, Dr. Kaemmerlen noted that Plaintiff had trouble walking and getting on and off the examination table.  Plaintiff reported that she did not cry so much when she took Effexor.  Tr. 249.  On August 2, 2007, Dr. Kaemmerlen thought that Plaintiff was "pitiful" and looked like she had "aged a good bit since [he] saw her last."  He stated that he thought she was "frustrated with disability and we assured her she will get it.  It is just going to take time and hassle [for] patients [until] the judge finally gives them what is obvious that they should have already had."  He also noted that Plaintiff seemed to be in a lot of discomfort, could not sit very comfortably, and had trouble getting on and off the examination table.  He noted that she had no radicular symptoms, had normal reflexes, and continued to smoke cigarettes.  Dr. Kaemmerlen assessed Plaintiff as having chronic back pain and depression.  Tr. 248.

In a letter dated April 10, 2008, Dr. Kaemmerlen opined that Plaintiff was only capable of sitting for thirty minutes to an hour and walking for fifteen minutes; would require frequent breaks and could not sit or walk continuously in a work setting; and would be limited to lifting and carrying

ten pounds or less.  He thought that she was incapable of sustaining a full-time competitive job that required activity on a sustained basis.  Tr. 252.

Dr. Sushil K. Das, an internist, examined Plaintiff on April 29, 2008.  Tr. 253-264.  Dr. Das noted that Plaintiff was able to climb on and off the examination table without difficulty; had muscle power that was 5/5 bilaterally in both her upper and lower extremities; her sensation was intact to pain, touch, and temperature; and her reflexes were 2+ bilaterally in both her upper and lower extremities. Range of motion testing of Plaintiff's cervical and lumbar spines as well as her extremities was within normal limits.  Plaintiff reported to Dr. Das that she could sit for thirty minutes, stand for thirty minutes, and move around for thirty minutes.  Dr. Das opined that "she could do much better," and did not think there was any reason she could not sustain a reasonable walking pace over a sufficient distance to carry out her activities of daily living.

Dr. Das completed a medical source statement opining that Plaintiff would be able to lift and carry up to twenty pounds frequently; sit for two hours, stand for one hour, and walk for one hour without interruption; sit, stand, or walk for up to six hours in an eight-hour day; frequently perform overhead reaching bilaterally; and continuously reach, handle, finger feel, and push/pull; frequently use foot pedals; never climb ladders or scaffolds; and only occasionally climb ramps and stairs, kneel, crouch, or crawl.  In the range of motion chart, Dr. Das did not note any abnormal findings, and indicated that Plaintiff performed well on tandem walking and lumbar spine range of motion.

On July 10, 2008, Dr. Kaemmerlen noted Plaintiff had difficulty walking and getting up from her chair.  He found that Plaintiff's squatting was abnormal and prescribed Mobic.  Tr. 266- 269.

In what appears to be a response to Dr. Das' findings, Dr. Kaemmerlen prepared an undated narrative report.  Tr. 272-274.  He wrote that Plaintiff did not have rheumatoid arthritis, but probably

had osteoarthritis of moderate severity. Dr. Kaemmerlen opined that Plaintiff would have more bad than good days and would likely be absent fifty percent of the time because of her illness. He also stated that Plaintiff had urinary incontinence and would require access to a restroom frequently. Dr. Kaemmerlen wrote that there were no gross abnormalities of any of the small joints of Plaintiff's hands or shoulders although there was limited range of motion superiorly with her shoulders. There was no gross effusion or inability in either knee, but marked crepitus to flexion and extension of Plaintiff's knees. Straight-leg raise testing was essentially normal, and he detected no evidence of sciatic knee dysfunction in either leg. Dr. Kaemmerlen noted that Plaintiff's overall musculature strength was good, probably better than that of the average woman with excellent strength in her quadriceps, biceps, calf muscles, forearm, and triceps. Dr. Kaemmerlen opined that the discrepancy with his findings versus Dr. Das's findings "was in the superficial inspection of this patient by physical exam."

Dr. Kaemmerlen wrote that Plaintiff's reported pain level was 6-7 per day (relieved 25 to 30 percent by pain medication) and her fatigue level was 5-6. Dr. Kaemmerlen opined that in an eight-hour day, Plaintiff could sit for no longer than thirty minutes before she had to get up and move around. She reported to him that she could walk less than ten minutes, or about 100 to 150 feet, before she needed a rest. Dr. Kaemmerlen opined that it would not be recommended medically for Plaintiff to continuously walk or sit in a work setting. He thought that Plaintiff could never lift up to twenty pounds, but could occasionally lift up to ten pounds and probably would have insignificant limitations in repetitive reaching, handling, and fingering. Tr. 272-274.

## HEARING TESTIMONY

Plaintiff testified at the hearing that she would be unable to work due to her pain.  Tr. 282.

She reported that she returned to work for one day, experienced a pain level of eight, realized she

would not be able to keep up with the work, and left in tears.   Tr. 282, 301.  Plaintiff testified that

her back pain increased since her surgery.  She stated that since her surgery she had no diagnostic

studies because she had no insurance. Tr. 283.  Plaintiff said she had osteoarthritis in her lower joints

because she could "feel it."  She said that Dr. Kaemmerlen was the only doctor who treated her and

he did so every three to four months.  Tr. 284.

Plaintiff said that she had problems walking long distances because of pain in her low back

that radiated down her leg.  Tr. 286.  She reported that she had trouble sitting for a long time and

estimated she could only sit for thirty minutes to an hour.  Tr. 286-287.  Plaintiff testified that her

hands were sore and she would only be able to use them for about an hour.  Tr. 287.  She said her

physician restricted her from lifting more than ten to twenty pounds.

Plaintiff folded laundry, but her daughter-in-law loaded and unloaded the washer and dryer.

Additionally, Plaintiff washed dishes, prepared simple meals, spent weekends with her boyfriend,

and went out to eat once every couple of weeks.  Tr. 288-289.  Plaintiff could slowly take care of her

personal needs.  When her knees bothered her "real bad," she needed help getting up.  Tr. 290.

## DISCUSSION

Plaintiff alleges that the ALJ: (1) failed to properly perform the fifth step of the sequential

analysis;[2] (2) erred in relying on VE testimony that cited general job categories rather than giving

---

[2]In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must
follow the five-step sequential evaluation of disability set forth in the Social Security regulations.
(continued...)

13

specific job titles; (3) failed to include Plaintiff's nonexertional impairment of a moderate limitation of ability for concentration, persistence, or pace in his hypothetical to the VE; (4) failed to properly evaluate the medical evidence of record; (5) failed to give proper weight to the opinion of her treating physician (Dr. Kaemmerlen); and (6) failed to indicate the weight given to the opinion of Dr. Das, a consultative examiner.[3]   The Commissioner contends that the ALJ's decision is supported by substantial evidence[4] and correct under controlling law.

A.     Evaluation of Medical Evidence

Plaintiff alleges that the ALJ failed to give appropriate weight to the opinion of her treating physician (Dr. Kaemmerlen) and erred in failing to indicate the weight given to the opinion of consultative examiner Dr. Das.  The Commissioner argues that the ALJ properly evaluated the medical evidence and found that Dr. Kaemmerlen's opinions were not entitled to controlling weight as they were inconsistent with the remainder of the medical evidence including the findings of

---

[2](...continued)
See 20 C.F.R. § 404.1520.   The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy.  See id.

[3]In her brief, Plaintiff also argued that the ALJ failed to consider that she was closely approaching advanced age.  She later withdrew this argument.  See Plaintiff's Reply Brief at 15, n. 14.

[4]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966).  It must do more, however, than merely create a suspicion that the fact to be established exists.  Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Plaintiff's treating physician Dr. Keller, Dr. Kaemmerlen's own medical notes, the findings of Dr. Das, and the opinions of the State agency medical consultants. Additionally, the Commissioner argues that any error as to not designating what weight was accorded to Dr. Das's opinion is harmless as the RFC found by the ALJ does not conflict with Dr. Das's findings.

Plaintiff argues that the ALJ erred in rejecting Dr. Kaemmerelen's opinions based on Dr. Kaemmerlen making conflicting statements about the effects of her depression. Specifically, she asserts that Dr. Kaemmerlen's statements are not conflicting in that Dr. Kaemmerlen did not mention Plaintiff's depression until October 2005 because she was not diagnosed with depression before that time. She claims the ALJ erred in discounting Dr. Kaemmerlen's limitations based on Plaintiff's osteoarthritis because the ALJ himself found that osteoarthritis was a severe impairment and Dr. Das also diagnosed Plaintiff with arthritis.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the

physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527.  Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p.

The ALJ's decision to discount Dr. Kaemmerlen's opinions of disability is supported by substantial evidence.  The ALJ discounted these opinions in part because they are opinions on an issue reserved to the Commissioner and thus are not entitled to controlling weight or special significance. Tr. 35.  A conclusory opinion of disability is not controlling since the issue of disability is the ultimate issue in a Social Security case and the issue is reserved for the Commissioner.  See 20 C.F.R. § 404.1527(e)(1); Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027 (10th Cir. 1994); see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)(statements that a claimant could not be gainfully employed are not medical opinions, but opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner); King v. Heckler, 742 F.2d 968 (6th Cir. 1984); Montijo v. Secretary of Health & Human Servs., 729 F.2d 599, 601 (9th Cir.1984).

The ALJ also discounted Dr. Kaemmerlen's opinions because the findings made during the course of his treatment do not support his conclusions.  See Tr. 35-36.  In particular, the ALJ noted that the findings are not supported by x-rays or positive findings on physical examination.  He also noted that neither Dr. Keller nor Dr. Das concurred in the diagnosis of osteoarthritis.  Although Dr. Das diagnosed Plaintiff with arthritis, he found that it was mild.  See Tr. 261.

16

Additionally, the ALJ properly discounted Dr. Kaemmerlen's opinion because it is inconsistent with the findings of treating physician Dr. Keller. As the ALJ noted, Dr. Keller found in February 2005 that Plaintiff had recovered from surgery and released her to work without restriction as of March 2005. Tr. 36.

Plaintiff argues that the ALJ erred by discounting Dr. Kaemmerlen's opinion based on Dr. Kaemmerlen making conflicting statements about the effects of her depression. Substantial evidence supports the ALJ's decision to accept Dr. Kaemmerlen's opinion only to the extent that Plaintiff's depression limited her to unskilled work. See Tr. 32. Review of Dr. Kaemmerlen's treatment notes fails to reveal any notations concerning depression or treatment for such prior to Dr. Kaemmerlen's completion of a form from Plaintiff's attorney on October 21, 2005 in which he opined that Plaintiff had depression and was only capable of low stress jobs (Tr. 221). On a form dated May 2, 2005, the ALJ stated that Plaintiff was capable of moderate stress. There is no indication in the treatment notes of any change in Plaintiff's psychological condition between that time and the completion of the October 21, 2005 form. See Tr. 222 (Dr. Kaemmerlen's treatment notes from June 10 and July 25, 2005). There is no evidence of any counseling, treatment by a specialist, or hospitalization for any mental health condition. Plaintiff herself did not list any medications for depression on an undated medication list (Tr. 139), wrote on one form that Effexor was first prescribed in February 2006 (Tr. 137), and another that Effexor was first prescribed in April 2006 (Tr. 134). In his September 2006 narrative, Dr. Kaemmerlen merely stated that depression would contribute to Plaintiff's functional limitations (Tr. 155). In his undated narrative, he wrote that Plaintiff had "depression as you might expect because she has no income," but that he did not think that her chronic bronchitis or depression "is bad enough to warrant disability." Tr. 272. Although the ALJ discussed Dr. Kaemmerlen's

statements concerning depression on page 12 of his decision (Tr. 32), he specifically set out his reasons for discounting Dr. Kaemmerlen's opinions of disability on pages 15 and 16 of his decision (Tr. 35-36).

Plaintiff argues that the ALJ erred by not designating what weight he gave Dr. Das's opinion. She claims that this is significant because Dr. Das limited Plaintiff to sitting for one hour at a time, standing/walking for one hour at a time, only occasionally climbing stairs/ramps, never climbing ladders, scaffolds, and only occasionally kneeling, crouching, or crawling. Plaintiff's Brief at 33-34. Review of the ALJ's decision reveals that although the ALJ may have not specifically articulated the exact weight given to Dr. Das' opinion, he obviously accepted it as to Plaintiff's capacity to lift. Tr. 32.

Any error in not specifically stating what weight was accorded to Dr Das' opinion is harmless error as the jobs which the ALJ found Plaintiff capable of performing did not exceed Dr. Das' limitations. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir.1994)(finding an ALJ's error harmless where the ALJ would have reached the same result notwithstanding an error in his analysis); Stout v. Commissioner Soc. Sec., 454 F.3d 1050, 1055 (9th Cir. 2006)(mistakes that are "nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless error); Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004)(noting the principle of harmless error applies to Social Security disability cases). Further, Dr. Das opined that he "did not see any problem that will prevent [Plaintiff] from doing normal physical activity." Tr. 27-28, 255. Although Dr. Das limited standing, walking, and sitting to one hour at a time each, he also found that Plaintiff would be able

to perform these activities for six hours in an eight hour day. Tr. 27, 257.[5]  The limitations for never climbing ladders, scaffolds, and to only occasionally kneel, crouch, or crawl are accounted for in the ALJ's RFC limitations which included not working around hazards (ladders, scaffolds) and no squatting or bending from the waist (kneeling, crouching, and crawling). Tr. 31.  Further, limitations on the ability to crawl and kneel "would be of little significance in the broad world of work," and crawling is a "relatively rare activity even in arduous work."  SSR 85-15; see also SSR 83-14 (citing an inability to crawl on hands and knees or ascend or descend scaffolding as having little effect on the unskilled light occupational base).  The term "squat" is not defined in the Social Security Rulings nor is it listed as a postural category on the Physical RFC Assessment.  The rulings and RFC assessment do, however, list "crouch" which is defined as "bending the body downward and forward by bending both the legs and spine." SSR 85-15.  In comparing the definitions of "crouch" and "squat," it is evident that these terms are synonymous. See Chavez v. Astrue, 699 F.Supp.2d 1125, 1133 n. 5 (C.D.Cal.2009) (describing "crouch" and "squat" as "essentially synonymous").  Further, a crouching limitation has little, if any impact, on the sedentary or light occupational base. See SSR 83-14 (explaining "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch .... ")(emphasis added).

---

[5]The ALJ did not include a need for a sit/stand option, but the VE testified that the jobs identified permitted a sit/stand option and did not conflict with the DOT. Tr. 307. The DOT could not conflict with a sit/stand limitation as it does not specifically address such a limitation.

B.    <u>State Agency Physicians</u>

Plaintiff appears to argue that the ALJ should not have relied on the opinions of the state agency physicians because she is not sure that they are physicians.[6]  The Commissioner argues that they are physicians as both of the RFC forms were electronically signed and contain a space for the medical consultant's signature and medical consultant's code as set forth in the Program Operations Manual System ("POMS").  <u>See</u> SSA POMS DI 26510.089, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510089 (last visited July 27, 2011).    The Commissioner provides that Dr. Fass's consultant code is 45, indicating a medical specialty in surgery, and that Dr. Clark's consultant code is 20, indicating a medical specialty in neurology.  <u>See</u> SSA POMS DI 26510.090, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510090 (last visited July 27, 2011).

The Eastern District of Tennessee addressed a similar argument in <u>Woods v. Astrue</u>, No. 2:09-CV-215, 2010 WL 5376285 (E.D. Tenn. Nov. 17, 2010),[7] and concluded that the claimant's suggestion that the assessment was not completed by a medical doctor was not supported by the

_____

[6]The ALJ did not err in relying on the opinions of the state agency physicians.  <u>See</u> 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2); SSR 96-6p ("Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review.").

[7]Additionally, the "DoctorFinder" portion of the American Medical Association's website lists Dr. Hugh Clarke as a physician with a self-designated primary specialty of neurological surgery and Dr. Stephen Fass as a physician with a self-designated primary specialty of general surgery.  <u>See</u> https://extapps.ama-assn.org/doctorfinder (last visited July 26, 2011).  Listings on the South Carolina Department of Labor, Licensing and Regulation's Licensee Look-Up website reveal that the South Carolina Medical Board lists Dr. Hugh Clarke is a licensee in good standing through June of 2013, and Dr. Stephen Fass as licensed through June of 2011 (i.e. during the relevant time period).  <u>See</u> https://verify.llronline.com/LicLookup/Med/Med.aspx?div=16 (last visited July 27, 2011).

evidence where the RFC form identified the person who completed the form as a medical consultant and contained the "Medical Consultant's Code" indicating a specialty in internal medicine, and there was further evidence that the person in question was a medical doctor as the Disability Determination and Transmittal ("DD&T") form listed him with "M.D." after his name and provided his specialty code. Here, Plaintiff's argument that the assessments were not completed by physicians is not supported by the evidence. As noted above, the RFC forms identified the persons who completed the forms as medical consultants and contained codes for their specialties. Further, the DD&T forms listed the persons in question with "M.D." after their names and included specialist codes. See Tr. 56-57.

C.      Hypothetical to the VE

Plaintiff alleges that the Commissioner erred at step five of the sequential analysis because he did not require the VE to cite specific jobs in response to the ALJ's hypothetical rather than citing general job categories and by failing to include Plaintiff's nonexertional impairment of a moderate limitation of ability for concentration, persistence, or pace in his hypothetical to the VE. The Commissioner contends that the ALJ's step 5 finding is supported by substantial evidence and free of harmful legal error. In particular, the Commissioner notes that the ALJ did identify the specific job of surveillance systems monitor, the VE's testimony was not insufficient merely because he identified broad occupational categories in which numerous jobs existed that Plaintiff could perform, and the finding could not be found invalid simply because the VE identified too many jobs that Plaintiff could perform. The Commissioner argues that the ALJ adequately accommodated Plaintiff's moderate limitation in concentration, persistence, or pace by finding and including in his hypothetical to the VE that Plaintiff could perform entry-level unskilled work.

21

In order for a VE's opinion to be relevant or helpful, it must be based upon a consideration of all the other evidence on the record and must be in response to hypothetical questions which fairly set out all of the plaintiff's impairments. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The questions, however, need only reflect those impairments that are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

Contrary to Plaintiff's assertion, the ALJ specifically did identify one job which a claimant with Plaintiff's limitations could perform. The VE identified the job of surveillance systems monitor, with 150 jobs locally, and about 200,000 jobs nationally. Tr. 306. The Fourth Circuit Court of Appeals has found that 110 jobs does not constitute an insignificant number of jobs. Hicks v. Califano, 600 F.2d 1048 (4th Cir. 1979). The Eighth Circuit found that 500 jobs was a significant number in Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988); the Eleventh Circuit held that 174 jobs locally and 1600 statewide constituted a significant number in Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987); and the Tenth Circuit, refusing to draw a bright line, found that 650-900 jobs was a significant number in Trimiar v. Sullivan, 966 F.2d 1326, 1330-32 (10th Cir. 1992).

Further, the VE testified that person with Plaintiff's limitations could perform numerous other jobs in the broader occupational categories of packing, labeling, assembly, sorting, and quality control. Tr. 306. As noted by the Commissioner, in the assembly category alone, numerous jobs are described in the Dictionary of Occupational Titles ("DOT") as unskilled light jobs that are consistent with Plaintiff's RFC including Assembler, Small Products I (DOT No. 706.684-022), Light Bulb Assembler (DOT No. 692.685-118), and Basket Assembler I (DOT No. 669.685-014).

The ALJ did not err in failing to include a moderate limitation of concentration, persistence, or pace in his hypothetical to the VE or in his RFC assessment. The ALJ adequately accommodated

22

Plaintiff's moderate limitation in concentration, persistence, or pace in his hypothetical to the VE and RFC assessment by limiting Plaintiff to performing unskilled work.  The ALJ's RFC/hypothetical assessment must accommodate his findings that are included on the Psychiatric Review Technique Form ("PRTF").  See SSR 96-8p.  The broad criteria on the PRTF, however, do not constitute specific mental RFC findings, and language from the PRTF is not appropriate for inclusion in the RFC assessment. See Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir. 2002).  SSR 96-8p specifically provides that:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p.

The ALJ fulfilled his obligation under the regulations by assessing the severity of Plaintiff's mental impairments using the PRTF (Tr. 30-31).  See 20 C.F.R. § 404.1520a.  He captured his finding on the PRTF that Plaintiff had "moderate" limitations in concentration, persistence, or pace in his RFC determination and hypothetical question to the VE by finding that she was limited to entry-level unskilled work, which he stated consisted of simple repetitive tasks (Tr. 31, 305).  See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008)(a limitation to simple tasks adequately captures moderate limitations in concentration, persistence, or pace).

## CONCLUSION

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence.  This Court may not reverse a decision simply because a plaintiff has

produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra. Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. Blalock v. Richardson, supra. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, supra. It is, therefore,

RECOMMENDED that the Commissioner's decision be affirmed.


Joseph R. McCrorey
United States Magistrate Judge


July 29, 2011
Columbia, South Carolina

24